UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Bankruptcy Case 19-82572 |
| Tomasz Lemiszka, | ) | |
| | ) | Chapter 7 |
| Debtor. | ) | |
| | ) | Judge Lynch |
| | ) | |
| Polish & Slavic Federal Credit Union, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adversary No. 19-96032 |
| | ) | |
| Tomasz Lemiszka, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION</u>

In December 2016, the Debtor, Tomasz Lemiszka, secured a loan from Plaintiff, Polish & Slavic Federal Credit Union (the "Credit Union") in order to refinance his purchase of a 2010 BMW 5 series automobile (the "vehicle").  But shortly after this seemingly smooth start, things began to run off the road.  The Credit Union never received title to the vehicle and its lien was not shown on the document when the car was wrecked in a February 2019 accident.  Although the Credit Union was properly listed as a loss payee on the vehicle's insurance policy, the check for the insurance proceeds was issued solely in the Debtor's name.  At the end of the day, the

Credit Union never saw any of the insurance money as Debtor used the proceeds for his own purposes, including to pay past-due rent owed by his struggling children's entertainment venue. That business failed and the Debtor filed for bankruptcy relief.

The Credit Union now asks the court to except the debt due it from discharge under sections 523(a)(2)(A), (a)(2)(B), and (a)(6) of the Bankruptcy Code, and to award it a money judgment of $13,201.43, plus interest, costs and attorney's fees.

After trial, the court finds that the Credit Union has failed to meet its burden of demonstrating that the debt is non-dischargeable.

## JURISDICTION

Discharge is a right expressly created by title 11 and would have no existence if not created by the Bankruptcy Code. Thus, proceedings on an objection to a debtor's discharge or an objection to the dischargeability of a debt arise in a case under title 11. *Kontrick v. Ryan*, 540 U.S. 443, 447-48 (2004). This court has subject matter jurisdiction under 28 U.S.C. § 1334(b) and Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois. This is a core proceeding under 28 U.S.C. § 157(b)(2)(I). "A bankruptcy judge has constitutional authority to enter final judgment as to dischargeability." *Bukovics v. Navient* (*In re Bukovics*), 612 B.R. 174, 178 (Bankr. Ill. N.D. 2020). *See also Stern v. Marshall*, 564 U.S. 462 (2011) (matters of nondischargeability stem from the bankruptcy itself).

## PROCEDURAL HISTORY

The Debtor filed his voluntary chapter 7 petition on November 5, 2019. The Credit Union commenced this adversary proceeding action on December 23, 2019. The parties conducted discovery following which the Credit Union moved for

summary judgment on four of the five counts in its complaint.[1]  The court denied the motion, explaining in its Memorandum Opinion (ECF No. 38) that several issues of material fact needed to be resolved at trial, most notably whether the Debtor intended to deceive or defraud the Credit Union for purposes of section 523(a)(2)(A) and whether his conduct amounted to an intentional tort for purposes of section 523(a)(6) and not merely a breach of contract.

The Credit Union then requested leave to amend its complaint to add a claim under 11 U.S.C. § 727(a).  Its request was heard and denied as untimely (ECF No. 52), and the case was set for trial to begin on May 17, 2021.  The parties timely filed stipulations of fact ("Stipulation," ECF No. 59), and the trial commenced as scheduled.

Two witnesses testified.  The Debtor, who was first called adversely by the Credit Union and then testified on his own case, generally testified about the loan agreement.  He unequivocally claimed to have intended to fully perform his obligations under the contract when he obtained the loan, but later ran into financial problems in 2018.  He further testified that he is a self-employed truck driver and that he and his spouse had operated their own business.  They launched their endeavor, "Big Wave Bounce Park," during the summer of 2018 as a venue for children's birthday parties.  The Debtor testified that the rent for the bounce park facility was about $6,000 per month but business proved to be unexpectedly slow.

---

[1] The Credit Union did not seek summary judgment on Count II, brought under section 523(a)(2)(B). It did not indicate at trial that it was abandoning that claim, the merits of which the court will now consider.

The Credit Union also called its representative, Peter Chaber, an employee of the Credit Union since July 2000 whose current title is Assistant Vice President, Senior Business Lending and Loss Mitigation Manager.  Chaber testified that he has worked in the field of loss mitigation for the past 11 years.  His principal responsibility in that capacity is to redeem and "find defaulted funds" for the Credit Union, including via repossessions and foreclosures.  Chaber was not the loan officer who worked with the Debtor on the loan.  Instead, Chaber testified, without objection, that he is familiar with the loan process at and procedures of  the Credit Union in general, and that his particular familiarity with the Debtor's account is based on his review of the Plaintiff's business records.

## FINDINGS OF FACT

The court has reviewed and considered the procedural background, stipulations, and the evidence and argument presented at trial, evaluating the credibility of the witnesses and the weight to the evidence received.[2]  From this review, the court makes the following findings of fact and determines the salient facts to be as follows pursuant to Fed. R. Bankr. P. 7052.[3]

---

[2] The court has taken judicial notice of the contents of the docket in this matter and the underlying bankruptcy case when appropriate. *See Levine v. Egdi,* No. 93 C 188, 1993 WL 69146, at *2 (N.D. Ill. Mar. 8, 1993) (authorizing a bankruptcy court to take judicial notice of its own docket).

[3] To the extent any findings of fact constitute conclusions of law, they are adopted as such, and to the extent that any conclusions of law constitute findings of fact, they are adopted as such.  Adjudicative facts also are found and determined later in this Memorandum Opinion.

The Debtor has been a member of the Credit Union since 2014.[4] On or around December 5, 2016, he applied for a loan to refinance the BMW Bank of North America ("BMW Bank") loan which originally financed his purchase of the vehicle. The Credit Union approved the loan in the amount of $21,675, to be paid back in monthly installments of $399.54 beginning January 4, 2017. (Pl. Ex. 2.) Although the Debtor testified that he did not review the document before signing it, it is undisputed that the Debtor executed the instrument at or around the date indicated. (Stipulation ¶ 8.)

Under the loan agreement, the Debtor agreed that the vehicle would secure his debt and "to have the [Credit Union's lien] shown on the title". (Pl. Ex. 2 at 1, 4; Stipulation ¶ 9.) The Debtor also promised to keep the vehicle insured against loss and damage, to "make the insurance policy payable" to the Credit Union, and to promptly notify the Credit Union if the vehicle was damaged. (Pl. Ex. 2 at 4; Stipulation ¶ 9.)

On December 5, 2016, the Debtor entered into an additional "agreement" with the Credit Union to authorize BMW Bank, upon full settlement of its loan, to forward title to the vehicle directly to the Credit Union.[5] (Pl. Ex. 4; Stipulation ¶ 10.) This

---

[4] Although there were some references during trial to the fact that the Debtor had at least one deposit account with the Credit Union, there was no evidence presented concerning the scope of the Debtor's financial activities with the Credit Union or whether he ever had any other loans with the Credit Union. Similarly, there was no testimony concerning the Debtor's overall experience or familiarity with loans in general or car loans in particular.

[5] Although the parties refer to Plaintiff's Exhibit 4 as an "agreement" between the Debtor and the Credit Union, the document is actually a letter addressed to BMW Bank and signed by the Debtor requesting that the title for the vehicle be sent directly to the Credit Union. Although it is not accurate to call this document an agreement between the parties, the court finds that the Debtor agreed to

was memorialized by a standard form letter which, according to Chaber, borrowers sign at closing. Chaber further testified that the Debtor signed all the documents that were provided to him and that there was nothing more the Debtor could have done at closing to ensure that the title was delivered to the Credit Union.

Pursuant to the loan agreement and the letter to BMW Bank, the Credit Union disbursed funds to BMW Bank totaling $24,932.85, which included $21,580 from the loan proceeds[6] and an additional $3,352.85 from the Debtor's account at the Credit Union. (Pl. Ex. 5.) After receiving this payoff amount, BMW Bank released its lien on the vehicle on January 2, 2017, recording its release on the original certificate. (Pl. Ex. 11.) Despite the Debtor's signed request that it forward the title directly to the Credit Union, BMW Bank sent it to the Debtor at his home address. (*Id.*) There was no evidence presented to suggest that the Debtor contacted BMW Bank or otherwise took any steps to revoke his letter directing it to forward the certificate directly to the Credit Union.

The Debtor implausibly claimed that he did not know that the certificate of title he eventually received from BMW Bank was to be provided to the Credit Union. His testimony that the Credit Union had not explained to him what was supposed to happen with the title when he signed the loan agreement, however, was

---

comply with this procedure when he promised, as part of the security agreement with the Credit Union, to "do whatever else [the Credit Union] think[s] is necessary to protect [its] security interest." (Pl. Ex. 2, Security Agreement ¶ 4.)

[6] An additional $95 from the loan proceeds was kept by the Credit Union for payment of a fee to the Secretary of State for changing title. (*See* Pl. Ex. 2.) According to Chaber, however, this amount remains in a suspense account since the Credit Union never received the title.

uncontroverted and credible. In any event, it is undisputed that the Debtor never provided the title to the Credit Union.

According to Mr. Chaber, the Credit Union normally gives its members four months to provide the title after refinancing before a loan servicing specialist follows up with a phone call, leaving the inference, not explored by further examination, that the lender would sometimes have to remind borrowers to send it certificates of title. Although he could not provide any specific dates and little foundation, Chaber testified, without objection, that the loan servicing specialist made several attempts to contact the Debtor by phone, but was not able to leave any messages because the Debtor's voicemail was not "set up." On cross-examination, the Plaintiff's representative admitted that the loan servicing specialist never spoke with the Debtor about the missing title. Likewise, Mr. Chaber had no knowledge of any email or letter sent to the Debtor regarding the missing title.

Aside from the certificate of title being sent to the Debtor rather than the Credit Union, nothing remarkable occurred in the initial months following the loan. According to Mr. Chaber, the Debtor likely had signed an automatic transfer agreement at closing to authorize automatic transfers of the monthly loan installment payments from his bank account to the Credit Union. It is uncontroverted that the first thirteen loan installments, January 2017 through January 2018, were paid via automatic transfer without issue. (Pl. Ex. 9.) The next four payments, February 2018 through May 2018, were also made by automatic transfer. However, these payments were late, and the Debtor paid a late fee of $25

for each. (*Id.*) After that, the payments became more sporadic. The Debtor made only two payments during the next four months. (*Id.*) On October 15, 2018, he paid the Credit Union $1,291.30 by check, which amount represented three monthly payments plus $100 in late fees.[7] The evidence shows that the Debtor made this payment in order to prevent threatened repossession of the vehicle. (*Id.*) On December 3, 2018, he made another monthly payment with late fee via automatic transfer. Finally, on February 2, 2019, the Debtor made a payment by check of $844.20, representing two additional monthly payments plus late fee. (*Id.*) The February payment was the last payment the Debtor made directly to the Credit Union, leaving a remaining principal balance of $13,201.43. (*Id.*)

On or around February 13, 2019, the Debtor's vehicle was involved in an accident. At that time, the vehicle was covered by an insurance policy issued by State Farm Mutual Insurance Company which listed the Credit Union as a loss payee. (Pl. Ex. 7; Stipulation ¶ 20.) After the accident, the Debtor alerted State Farm about the accident and the vehicle was subsequently declared a total loss. (Stipulation ¶ 19.) The Debtor never notified the Credit Union about the accident.

State Farm issued a check to settle the Debtor's insurance claim on February 23, 2019. It made its check payable to Tomasz Lemiszka in the amount of $18,095.31. (Pl. Ex. 8.) Both the Debtor and Mr. Chaber testified, without objection, that, even

---

[7] Mr. Chaber could not explain why there was a $235 discrepancy between the amount of the check received by the Credit Union ($1,526.30) and the amount paid towards the loan ($1,291.30) but speculated that it must have been transferred to a different account. This fact is not material to the court's analysis and need not be explored further.

though the Credit Union was listed as a loss payee on the insurance policy, State Farm issued the check payable to the Debtor because the Debtor had provided it with a "clean" certificate of title showing no liens.[8]

The Credit Union did not learn about the accident or the insurance claim payment until after the proceeds had been paid to the Debtor.  According to Mr. Chaber, sometime after the Debtor stopped making payments the Credit Union learned about the accident and the insurance payout from a Carfax report it obtained.

The Debtor deposited the funds he received from State Farm into his bank account. On March 4, 2019, the Debtor paid the landlord for Big Wave Bounce Park $12,500 from his account for past due rent.[9] (Pl. Ex. 10.)  The Debtor testified that even though the winter season should have been a good time for hosting indoor children's birthday parties, business was unexpectedly slow, and Big Wave found itself behind on rent and "in trouble."  Indeed, Big Wave owed its landlord almost $21,000 at the time of the March 2019 payment. (*Id.*)

The Debtor testified that despite these difficulties he remained optimistic that his business would "take off" given the positive reviews and repeat business it was enjoying.  Remarking that he put "every penny" into the business, he claimed to have

---

[8] The Debtor further testified that he asked State Farm who the check would be made payable to before it was issued.  He credibly testified that he did not ask State Farm to make its remittance out to him, claiming that it was the insurer who informed him how it would issue the check.  The Credit Union presented no evidence to show that the Debtor directed State Farm about the check should issue other than the form letter it had him sign.

[9] The Debtor acknowledged that he used the remaining proceeds to purchase a 2006 Ford F150 to replace the wrecked vehicle.

remained hopeful that eventually Big Wave would generate enough money to enable him to pay his creditors.  But the Debtor only made one additional partial rent payment of $2,000 in April 2019, and the business effectively closed that summer after the landlord announced that he found a new tenant who would assume the lease. In November 2019, the debtor filed his petition for relief.

At trial, the Debtor unequivocally testified that he intended to make all the payments when he took out the loan from the Credit Union.  Overall, the court found this testimony regarding the Debtor's intent to be credible, despite and taking note of the efforts of counsel to cast doubt on the Debtor's credibility by pointing out, among other things, various errors and omissions in his bankruptcy filings.  The Plaintiff did not present contrary evidence on that point.  Further, it is undisputed he made the payments due for sixteen months following his taking out the refinancing loan,[10] albeit while incurring late charges on the last four of those installments.  The evidence shows that his payments then became sporadic and late when paid, and the last made it appears in part to forestall repossession.  The  payments stopped altogether after the accident when vehicle was declared a total wreck.  The parties did not offer any evidence from State Farm, however, leaving uncontradicted the Debtor's unambiguous testimony that he did not tell BMW Bank to send him the title certificate or instruct the insurer how to make out its settlement check.

---

[10] The Debtor's evidence, however, did not support his counsel's assertion that he "set up automatic transfers" from his account for "eighteen months," as opposed to the sixteen months indicated by the payment records put in evidence, and both parties failed to pursue the particular circumstances surrounding the cessation of these payments.

The evidence submitted was scant and did not prove intent, malice, or willfulness.  At best, the Plaintiff established that the Debtor did not satisfy the terms of the loan agreement while he took advantage of a fortuitous chain of events.  The evidence reveals the Debtor to be grasping at straws when his financial situation was upended months after taking out the loan, as he vainly attempted to prop up a business which he hoped would generate income.  But as discussed below, that evidence is not enough to except this debt from discharge.

## CONCLUSIONS OF LAW

"The determination of whether or not a certain debt is dischargeable is a legal conclusion based upon the facts in the case." *U.S. Life Title Ins. Co. of N.Y. v. Wade (In re Wade)*, 26 B.R. 477, 480 (Bankr. N.D. Ill. 1983).  "It is well-established that exceptions to discharge are construed strictly against a creditor and liberally in favor of the debtor." *Andringa v. Acker (In re Acker)*, No. 19-21349-KMP, 2021 WL 1346575, at *3 (Bankr. E.D. Wis. Mar. 31, 2021) (citing *In re Morris*, 223 F.3d 548, 552 (7th Cir. 2000)); *see also In re Chambers*, 348 F.3d 650, 654 (7th Cir. 2003) (stating that exceptions to discharge "are confined to those plainly expressed in the Code . . . and are narrowly construed in favor of the debtor").  The party seeking a finding that a debt is non-dischargeable bears the burden of proof by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291 (1991).

Here, the Credit Union proceeded to trial on all five counts of its adversary complaint.  In Count I, the Credit Union seeks to deny the discharge of the debt under section 523(a)(2)(A), alleging that it extended the loan based on the Debtor's false

representations that the loan would be secured by the vehicle, that the Debtor would have the Credit Union's lien shown on the title, and that he would promptly notify the Credit Union if the vehicle was damaged. Count II, brought under section 523(a)(2)(B), refers to the same alleged misrepresentations raised in Count I, alleging here they are "false written statements" on which it reasonably relied. The remaining counts seek the debt's exception from discharge under section 523(a)(6). Count III alleges that the Debtor "acted willfully and maliciously when he failed to provide insurance with title showing [the] Credit Union's lien after [the vehicle] was involved in an automobile accident" and "when he failed to turnover insurance proceeds from said automobile accident to Credit Union." Styled "Conversion of Vehicle's Title," Count IV asserts that despite the Plaintiff's "absolute right" to place its lien on the title certificate the Debtor never did so. Finally, Count V, captioned "Conversion of Insurances Proceeds," alleges that that the Plaintiff also had an "absolute right" to the insurance proceeds which the Debtor refused to turn over.

### A. The Claim for False Representations and Actual Fraud.

Section 523(a)(2)(A) excepts from discharge "any debt . . . for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by . . . false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." 11 U.S.C. § 523(a)(2)(A). This provision encompasses three separate grounds for excepting the debt from discharge: false pretenses, false representation, and actual fraud. "Scienter, or intent to deceive," is a "required element under section 523(a)(2)(A) whether the claim

is for a false representation, false pretenses, or actual fraud." *In re Freund*, 714 F. App'x 595, 597 (7th Cir. 2018) (citing *In re Yotis*, 548 B.R. 485, 495 (Bankr. N.D. Ill. 2016)).

To prevail under this section for false representations, the plaintiff must demonstrate "(1) that [the debtor] made a false representation or omission, which he either knew was false or made with reckless disregard for the truth; (2) that [the debtor] possessed an intent to deceive or defraud; and (3) that [the plaintiff] justifiably relied on the false representation." *Reeves v. Davis* (*In re Davis)*, 638 F.3d 549, 553 (7th Cir. 2011).  However, a broken promise of future performance will ordinarily not support relief under section 523(a)(2)(A).  *Rezin v. Barr (In re Barr)*, 194 B.R. 1009, 1017-18 (Bankr. N.D. Ill. 1996).  Such a promise "constitutes a false representation under § 523(a)(2)(A) only if the debtor made the promise without an intention of ever keeping it." *Sullivan v. Ratz*, 551 B.R. 338, 345 (N.D. Ill. 2016) (citing *In re Casali*, 517 B.R. 835, 843 (Bankr. N.D. Ill. 2014)).

The Credit Union points to three allegedly false representations that it alleges were made by the Debtor in the loan agreement on which it relied:  that the loan will be secured by the vehicle, that the Debtor would cause the Credit Union's lien to be shown on the certificate of title, and that he would promptly notify the Credit Union if the vehicle is damaged.  The Credit Union proceeded to offer proof of the Debtor's failure to satisfy each of these obligations.  However, while these defaults may well support a claim for breach of contract, that is not enough to obtain relief under section 523(a)(2)(A).  The evidence presented fails to demonstrate that the Debtor knew these were false or that he intended to deceive the Credit Union with these statements at

the time he obtained the loan.  If anything, the evidence presented tends to favor the opposite conclusion.

As for the first statement, it is not disputed that the Debtor pledged the vehicle as collateral at the time the loan was made.  It is not disputed that the Debtor maintained insurance on the vehicle listing the Credit Union as a loss payee, consistent with his intending the vehicle to be security for the loan.  The Credit Union does not offer proof that he did otherwise, indeed, if anything, the record suggests a puzzling lack of concern on the part of the Credit Union about the status of its collateral until the accident years after it issued the loan.

Nor did the Credit Union establish that the Debtor's failure to carry out the "representation" in the loan agreement that he would have the Credit Union's lien shown on the certificate of title was false or made with the intent to deceive at the time the Credit Union made the loan.  In addition to pledging the vehicle as collateral at the time of closing, the Debtor also signed a letter directing BMW Bank to forward the title certificate directly to the Credit Union.  The evidence indicates that the Credit Union provided the Debtor what it required for the loan, including its form loan agreement and its letter of direction to the title holder, and the Debtor signed these instruments.  The Credit Union's representative acknowledged at trial that the Debtor did what he was asked to do at closing to ensure delivery of the title to the Credit Union and no evidence was presented to show that the Debtor did anything after closing to suggest that was not his intent, such as by counteracting his written direction or directing BMW Bank not to send the title to the creditor.

There also is no proof that the statement that the Debtor would promptly notify the Credit Union if the vehicle was damaged was false at the time it was made or that the Debtor intended to use it to deceive the Credit Union in order to obtain the loan.  For example, there is no evidence to suggest that the Debtor ever — let alone at the time of closing — intended to wreck the vehicle in order to collect the insurance. Nor does the Debtor's actions following his receipt of the loan — actions which include monthly payments for more than two years of more than $10,000 and causing the Credit Union to be listed as a loss payee on the vehicle's insurance policy — suggest that he made this promise without an intention of ever keeping it. Beyond the Debtor's own unequivocal denial under oath of any intent to deceive the Plaintiff at the time he obtained the loan, the fact that the Debtor later failed to comply with this term of the contract made more than two years before the accident and after the vehicle was declared a total loss does not outweigh the Debtor's unequivocal denial that he intended to do so or so deceive the Credit Union when he signed the loan agreement.

At trial the Credit Union also introduced the argument that the debt should be declared non-dischargeable under section 523(a)(2)(A) because of the Debtor's use of the insurance proceeds to pay the back rent of his business and to buy a truck to replace the wrecked vehicle.  The Supreme Court has held that the "term 'actual fraud' in section  523(a)(2)(A) encompasses forms of fraud, like fraudulent conveyance schemes, that can be effected without a false representation." *Husky Int'l Elecs., Inc. v. Ritz,* 136 S. Ct. 1581, 1586 (2016).  Although the term fraud "connotes deception or trickery generally, the term is difficult to define more precisely." *Id.; see also*

15 of 24

*McClellan v. Cantrell*, 217 F.3d 890, 893 (7th Cir. 2000) (explaining that actual fraud is defined broadly to include "any deceit, artifice, trick, or design involving direct and active operation of the mind, used to circumvent and cheat another").

The court finds that the Credit Union failed to meet its burden to show that the Debtor's use of the insurance proceeds rises to the level of actual fraud. The Debtor is a truck driver by trade.  His business acumen or sophistication with insurance matters — if any — was not presented.  The Credit Union also did not present evidence that shows the Debtor deceived the Plaintiff about the accident or insurance claim.  He was not shown to have employed deception or trickery with regard to his insurance claim.  It is undisputed that the Debtor caused the insurer to list the Credit Union as a loss payee on the insurance policy and the Debtor's testimony that he raised with State Farm whether the Credit Union should be named as a payee on the settlement check stood uncontradicted.  Both parties' witnesses surmised consistently in their testimony that the insurer chose to name the Debtor only on the check.  The evidence also did not show that the Debtor falsified or forged the title, but rather provided State Farm with what was in his possession.  The court also will note that neither party offered to furnish any testimony by State Farm, though both had ample opportunity to do so.

The evidence shows that once he obtained the insurance proceeds, the Debtor used much of the money to pay down the business debt in what turned out to be a futile effort to prop up an additional source of income.  While this decision to use the funds for his business rather than pay off the loan with the Credit Union may have

violated the terms of the loan agreement, the Credit Union did not establish that his actions constitute an actual fraud for purposes of section 523(a)(2)(A).

For all these reasons, the court will enter judgment in favor of the Debtor on Count I.

### B. The Claim for False Written Statements.

Section 523(a)(2)(B) provides a debt from discharge when the creditor can "prove that the debtor made a materially false written statement about his financial condition with the intent to deceive, and that the creditor reasonably relied on the statement." *In re Cohen*, 507 F.3d 610, 613 (7th Cir. 2007); *see also* 11 U.S.C. § 523(a)(2)(B). "[A] statement is 'respecting' a debtor's financial condition if it has a direct relation to or impact on the debtor's overall financial status," even where it is a "statement about a single asset." *Lamar, Archer & Cofrin, LLP v. Appling*, 138 S. Ct. 1752, 1761 (2018).

As an initial matter, the court notes that Count II was not clearly plead in the alternative to Count I, even though the two counts appear to be inconsistent since they are based on the same allegedly false statements made in the loan agreement. These false statements cannot simultaneously be both a "statement . . . respecting the debtor's . . . financial condition," as is required for a claim under section 523(a)(2)(B), and also something "other than a statement respecting the debtor's . . . financial condition," for purposes of section 523(a)(2)(A). The court need not dwell on this oddity, however, because it finds that the allegedly false statements concerning the security interest, allowing the lien to be shown on the title and the

promise to report damage to the vehicle are not statements respecting the Debtor's financial condition.  Therefore, Count II must fail as a matter of law.[11]

### C.  The Section 523(a)(6) Claims for Willful and Malicious Injury.

Debts "for willful and malicious injury by the debtor to another entity or to the property of another entity" also may be excepted from discharge. 11 U.S.C. § 523(a)(6).  To except a debt from discharge under section 523(a)(6), the plaintiff must demonstrate "(1) an injury caused by the debtor (2) willfully and (3) maliciously." *In re Calvert*, 913 F.3d 697, 700 (7th Cir. 2019).  Willfulness requires "a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury." *Gerard v. Gerard*, 780 F.3d 806, 811 (7th Cir. 2015) (quoting *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998)) (emphasis omitted).  The willfulness element "is judged by an objective standard: it can be found either if the debtor's motive was to inflict the injury, or the debtor's act was substantially certain to result in injury." *Id.*  The debtor's act is willful if it is shown he both intended the act and the injury resulting. *Id.* at 61-62.  *See also Jendusa–Nicolai v. Larsen*, 677 F.3d 320, 324 (7th Cir. 2012) (A willful injury is one the debtor "inflicted knowing he had no legal justification and either desiring to inflict the injury or knowing it was highly likely to result."). To prove malice, the plaintiff must demonstrate that the debtor acted "in conscious disregard of [his] duties or without just cause or excuse." *Calvert*, 913 F.3d at 701.

---

[11] Even if these statements were "respecting" the Debtor's financial condition, Count II would still fail for the same reasons identified above with respect to Count I, namely that there is no evidence these statements were false or made with the intent to deceive at the time of closing, which is fatal to the claim. *See* 11 U.S.C. §523(a)(2)(B)(i) and (iv).

The language of section 523(a)(6) indicates that debts excepted under it must result from an intentional tort. *See Kawaauhau v. Geiger*, 523 U.S. at 58, 61. Although it has never expressly so held, the Seventh Circuit has strongly suggested that only intentional torts fall within the ambit of section 523(a)(6).  For example, in a decision considering claims of breach of contract, tortious interference, and unjust enrichment, the court noted that "only the intentional torts of interference and conversion could plausibly constitute willful and malicious injury." *First Weber Group, Inc. v. Horsfall*, 738 F.3d 767, 773 (7th Cir. 2013); *see also In re Braverman*, 463 B.R. 115, 119 (Bankr. N.D. Ill. 2011) ("As the Supreme Court observed in *Kawaauhau*, the phrase 'willful and malicious injury' is one that triggers in the lawyer's mind the category intentional torts." (quoting *Kawaauhau,* 523 U.S. at 61)). Numerous lower courts within this Circuit have so held. *See, e.g., Groom v. Krook (In re Krook*, 615 B.R. 479, 487 (Bankr. N.D. Ill. 2020); *United Providers, Inc. v. Pagan (In re Pagan)*, 564 B.R. 324, 326-27 (Bankr. N.D. Ill. 2017); *Taylor v. Snyder (In re Snyder)*, 542 B.R. 429, 438-44 (Bankr. N.D. Ill. 2015).  Based on this clear weight of authority, this court has concluded that an intentional breach of contract is not enough to support a claim under section 523(a)(6) unless the debtor's conduct also gives rise to an independent tort. *Polish & Slavic Federal Credit Union v. Lemiszka (In re Lemiszka),* 2020 Bankr. LEXIS 3614, at *20-21 (Bankr. N.D. Ill. Dec. 30, 2020).

**Count III.**   The Plaintiff generally returns to the Debtor's alleged titling failures and his conduct following the accident to argue that his actions were willful

and malicious for purposes of section 523(a)(6). [12]  But here again the Credit Union's proof goes only so far as to support a claim for breach of contract and fails to show any independent tortious conduct on the part of the Debtor. *See Gerard*, 780 F.3d at 811.  As the case with the section (a)(2) counts, discussed above, there was no evidence presented to establish that the Debtor deliberately or intentionally intended to inflict the injury sustained by the Credit Union.  The Debtor instead testified that he hoped his business would be successful enough to enable him to pay off his creditors, but later circumstances prevented him from doing so.  While this testimony is somewhat self-serving, this, the only direct evidence of his intentions, stands uncontroverted.  In the end, the facts do not show that the Debtor's conduct amounted to anything more than a possible breach of contract, perhaps an intentional breach, but nevertheless one that was not shown to be willful and malicious and constitute an independent intentional tort. *See also United Providers, Inc. v. Pagan (In re Pagan)*, 564 B.R. 324, 326 (Bankr. N.D. Ill. 2017) (cautioning that an intentional breach of contract "is not enough to support a claim under section 523(a)(6)").

**Conversion Claims.**  The Debtor raises various claims under theories of conversion in the two remaining counts.  In neither case, however, does the Plaintiff establish a predicate intentional tort, let alone meet its burden to prove the Debtor acted willfully and maliciously to establish that its debt is non-dischargeable under section 523(a)(6).

---

[12] Count III adds an additional allegation that "Defendant took no actions [sic] to maintain and protect the Credit Union's interest in the Vehicle." (Compl. ¶ 52.)  Beyond the general facts discussed elsewhere in this Memorandum Opinion, however, the Plaintiff presented no evidence on that allegation.

In Count IV, the Credit Union raises a claim for conversion of the vehicle's title, asserting that the Credit Union had "an absolute right" to place its lien on the title "under the Loan Agreement." (Compl. ¶ 60.)  Conversion is an intentional tort that may sometimes support a claim of non-dischargeability under section 523(a)(6). *See, e.g., Horsfall*, 738 F.3d at 773; *but see Kawaauhau,* 523 U.S. at 64 (explaining that "not every tort judgment for conversion is exempt from discharge" (citing *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 332 (1934))).  In order to establish the tort of conversion, the Credit Union must show that (1) it had a right to the property at issue; (2) it had an absolute and unconditional right to the immediate possession of the property; (3) it made a demand for possession; and (4) the Debtor wrongfully and without authorization assumed control, dominion, or ownership over the property." *Stevens v. Interactive Fin. Advisors, Inc.*, 830 F.3d 735, 738 (7th Cir. 2016) (citing *In re Karavidas*, 2013 IL 115767, ¶ 61).

The court need not discuss at length every element of the alleged tort or whether it supports relief under 523(a)(6), however, because the Credit Union failed to establish that it timely demanded possession.  As established by the testimony presented, approximately four months after BMW Bank mistakenly sent the title to the Debtor, a loan servicing specialist at the Credit Union made several attempts to contact the Debtor by phone.  But, he claimed without foundation, the specialist was unable to leave a message because the Debtor's voicemail "was not set up."  Although Mr. Chaber, the Credit Union's witness, was not able to provide much credible factual information about these calls — even as to such rudimentary matters as exactly when

they were made, how many calls there were, or when the attempts to reach the Debtor about the title ended — he admitted that the Plaintiff's loan servicing specialist never spoke with the Debtor regarding the missing title. He did not testify that the specialist left a message or that the Credit Union ever delivered a written demand to the Debtor. The Debtor credibly testified that the Credit Union did not discuss with him what was to be done with the title when he took out the loan, and later, when he spoke to the Credit Union several times later, its representative only discussed late payments and renewal of his insurance policy.

Count V is predicated on a conversion claim for the insurance proceeds. Here, too, the Credit Union failed to prove the necessary elements of the predicate intentional tort. It failed to show, among other things, that it had a specific property right in the insurance proceeds. It is undisputed that the check from State Farm was payable only to the Debtor. While the certificate of insurance introduced into evidence shows the Credit Union's lien on the car and indicates its claim for the loan, it did not establish the extent and quality of the Plaintiff's right, if any, to the check made payable solely to the Debtor. (*See* Pl. Ex. 7.)

Nor did the Credit Union prove, or even contend, that it demanded the insurance proceeds from the Debtor while he still possessed the funds. *See, e.g., Gates v. Towery*, 435 F. Supp. 2d 794, 801 (N.D. Ill. 2006) ("[I]n a conversion action involving money, the money must be 'capable of being described as a specific chattel.'" (quoting *Fonda v. Gen. Cas. Co. of Ill.*, 279 Ill. App. 3d 894, 899 (1996))). Likewise, the facts presented do not show that the Debtor did anything to influence or cause

22 of 24

State Farm to issue the check solely in the Debtor's name. The Credit Union never called a representative of State Farm to testify about the insurance claim or explain the relevant policies and procedures concerning when payments are made to a loss payee. Mr. Chaber admitted on cross-examination that the Credit Union consulted an attorney but did not bring any action against State Farm regarding the payment of the claim on the Debtor's vehicle. The evidence does not prove an independent intentional tort nor establish "a deliberate or intentional injury," as opposed to "merely a deliberate or intentional act that leads to injury." *Gerard*, 780 F.3d at 811.

For all these reasons, the court finds that the Credit Union failed to meet its burden to prove that the debt is non-dischargeable under section 523(a)(6). Accordingly, the court will enter judgment in favor of the Debtor on Counts III, IV, and V.

## CONCLUSION

As discussed above, the Credit Union has not proven that it may receive relief under sections 523(a)(2)(A), 523(a)(2)(B), or section 523(a)(6) of the Bankruptcy Code, and the Debtor's debt under the loan agreement therefore is fully dischargeable. Accordingly, judgment will be entered in favor of the Debtor and against the Plaintiff on all counts.

A separate judgment order will be issued concurrent with this Memorandum

Opinion giving effect to the determinations reached herein.


DATE: July 29, 2021




ENTER


Thomas M. Lynch
United States Bankruptcy Judge